UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| A.K.C.,<br><br>                    Plaintiff,<br><br>    vs.<br><br>KILOLO KIJAKAZI, ACTING<br>COMMISSIONER OF THE SOCIAL<br>SECURITY ADMINISTRATION;<br><br>                    Defendant. | 4:22-CV-04017-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, A.K.C., seeks judicial review of the Commissioner's final

decision denying her application for Social Security disability benefits under

Title II and Title XVI of the Social Security Act.[1]  Plaintiff has filed a complaint

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called
"Title II" benefits.  Receipt of both forms of benefits is dependent upon whether
the claimant is disabled.  The definition of disability is the same under both
Titles.  The difference—greatly simplified—is that a claimant's entitlement to
SSD/DIB benefits is dependent upon one's "coverage" status (calculated
according to one's earning history), and the amount of benefits are likewise
calculated according to a formula using the claimant's earning history.  There
are no such "coverage" requirements for SSI benefits, but the potential amount
of SSI benefits is uniform and set by statute, dependent upon the claimant's
financial situation, and reduced by the claimant's earnings, if any.  There are
corresponding and usually identical regulations for each type of benefit.  See,
e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-
step procedure under Title II and Title XVI).  Plaintiff filed her application for
both types of benefits.  Her coverage status for SSD benefits expires on

and motion to reverse the Commissioner's final decision denying her disability benefits and to remand the matter to the Social Security Administration for further proceedings.  See Docket Nos. 1, 8.  The Commissioner has filed her own motion seeking affirmance of the agency's decision below.  See Docket No. 10.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

**A.    Procedural History**

This action arises from Ms. C.'s application for Social Security Disability Insurance (SSDI) benefits and Supplemental Security Income (SSI) with a protected filing date of May 9, 2018, alleging disability starting December 15, 2015, due to migraines, anxiety, depression, PTSD, poor circulation, hand and foot numbness, and medication side effects.  T94, 105, 197, 199, 236, 286, 289. (citations to the appeal record will be cited by "T" followed by the page or pages).

---

December 31, 2020.  T20.  In other words, in order to be entitled to Title II benefits, Ms. C. must prove disability on or before that date.

[2] These facts are recited from the parties' stipulated statement of facts (Docket No. 7).  The court has made only minor grammatical, punctuation, and stylistic changes.

Ms. C.'s claim was denied at the initial and reconsideration levels, and Ms. C. requested an administrative hearing.  T120-140.

Ms. C.'s administrative law judge ("ALJ") hearing was held on February 4, 2021, where Ms. C. was represented by a non-attorney representative.  T41. The hearing was conducted by phone due to Covid-19 and lasted 46 minutes. T41, 64.  An unfavorable decision was issued March 31, 2021, by the ALJ. T15-29.

**B.     Decision of the ALJ**

The ALJ found that Ms. C.'s date of last insurance ("DLI") was December 31, 2020.  T20.  At Step One of the evaluation the ALJ found that Ms. C. worked after the alleged disability onset date, but the work activity did not rise to the level of substantial gainful activity.  Thus, the ALJ found Ms. C. had not engaged in substantial gainful activity since December 15, 2015, the alleged onset of disability date.  T20-21.

At Step Two, the ALJ found that Ms. C. had severe impairments of migraines, depression, anxiety, personality disorder, and post-traumatic stress disorder (PTSD).  T21.  The ALJ found that these severe impairments significantly limited Ms. C.' ability to perform basic work activities.  Id.

The ALJ stated that Ms. C. had non-severe impairments of hypertension and substance abuse.  Id.  The ALJ also stated, "She has also demonstrated moderate psychological signs and symptoms upon examination."  Id.

In Step Three, the ALJ found that Ms. C. did not have an impairment that meets or medically equals a Listing.  Id.  The ALJ found that Ms. C.'s

severe mental impairments caused mild limitations in her ability to understand, remember, and apply information; moderate limitations in her ability to interact with others; moderate limitations in her ability to concentrate, persist or maintain pace; and mild limitations in her ability to adapt or manage herself.  T22-23.  The ALJ stated that these limitations identified in the "paragraph B" criteria are not an RFC assessment and the mental RFC assessment requires a "more detailed assessment of the areas of mental functioning."  T23.

In Step Three the ALJ also stated that in accordance with SSR 19-4p she considered the claimant's migraines and evaluated it under Listing § 11.02 (epilepsy) criteria.  T21.  The ALJ stated:

> The record does not demonstrate generalized tonic-clonic seizure occurring once a month for at least three consecutive months despite adherence to prescribed treatment, nor does it describe dyscognitive seizures occurring at least once weekly for at least three consecutive months despite adherence to prescribed treatment.  The record similarly fails to show generalized tonic-clonic seizures occurring at least once every two months for at least four consecutive months despite adherence to prescribed treatment and a marked limitation in physical functioning; understanding remembering or applying information; interacting with others; concentrating, persisting or maintaining pace or adapting or managing herself.  Finally, the record does not document dyscognitive seizures occurring at least once every two weeks for at least three consecutive months despite adherence to prescribed treatment and a marked limitation in physical functioning; understanding remembering or applying information; interacting with others; concentrating, persisting or maintaining pace or adapting or managing herself.

T21-22.

4

The ALJ determined Ms. C. had an RFC for less than a full range of medium work: she could lift and carry 50 pounds occasionally and less than 20 pounds frequently, sit about 6 hours in an 8-hour workday, stand and/or walk about 6 hours in an 8-hour workday, and occasionally be exposed to extreme heat, cold, or excessive vibration.  T23.  Ms. C. could attend to, sustain concentration, and carry out simple and complex activities within a schedule.  Id.  She could meet the demands of a flexible and goal-oriented pace but could not perform work at a production-rate pace or with very short deadlines, and she is limited to occasional contact with the public.  T23-24.

The ALJ found that Ms. C.' statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the medical evidence and other evidence of record for the reasons explained in the decision.  T25.

The ALJ found at Step Four that Ms. C. was unable to perform her skilled past relevant work as a registered nurse.  T28.

The ALJ found at Step Five, relying on the testimony of a vocational expert, that there were other jobs existing in significant numbers in the national economy Ms. C. could perform, including the following representative sample of light and medium exertional unskilled jobs: hospital cleaner, linen room attendant, and housekeeper cleaner.  T28-29, 61-62.

The ALJ considered the opinions of the State agency medical consultant at the initial level and found them unpersuasive because they were inconsistent with the objective medical evidence.  T26.

The ALJ considered the opinions of the State agency medical consultant at the reconsideration level and found them persuasive because they were consistent with the objective medical evidence.  T26-27.

The ALJ considered the opinions of the State agency psychological consultant at the initial level and found them unpersuasive because they were inconsistent with the objective medical evidence.  T27.

The ALJ considered the opinions of the State agency psychological consultant at the reconsideration level and found them persuasive because they were consistent with the objective medical evidence.  Id.  The ALJ noted that the reconsideration level psychological consultant noted "particular limitations in [Ms. C.'] abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances."  Id.

The ALJ referred to both the consultative physical exam by Dr. Young and the consultative psychological exam by psychologist, Emily Blegen, Psy. D. (T24-26).

The ALJ considered the opinions of Ms. C.'s treating counselor, Ashley Termansen, LCSW-PIP, and found them unpersuasive because she is not an "acceptable medical source" and her opinions are "largely inconsistent with the objective medical evidence, particularly her own treatment notes, which routinely fail to describe symptoms as severe as her limitations would imply (Exhibits 15F; 16F; 17F)."  Id.

**C.     Appeals Council**

Ms. C. requested review of the ALJ's denial from the Appeals Council and
submitted additional evidence, including, a letter from her treating counselor,
Ashley Termansen, LSCW-PIP, dated September 14, 2021, which provides
additional information regarding Ms. C., (T8-9), and documentation from
Sanford Health and Call To Freedom ("CTF") regarding Ms. C.' work.  T35-38.
The Appeals Council considered the new evidence and stated that the evidence
from CTF did not show a reasonable probability of changing the outcome of the
decision, and the ALJ decided the case on March 31, 2021, so the other
evidence dated June 13, 2013, and September 14, 2021, "does not relate to the
period at issue."  T2.  The Appeals Council denied review making the ALJ's
decision the final decision of the Commissioner.  T1-2.  Ms. C. timely filed this
action.

**D.     Relevant Medical Evidence (chronological order)**

Ms. C. was evaluated at Keystone Treatment Center on September 13,
2016 and her Kent Score[3] and Wilson Score were both in the borderline range
and her IQ was estimated at 75.  T352.  Her Beck Depression Inventory
revealed severe depression.  Id.  Her history included suicide attempts in 2004

---

[3] The "Kent score" appears to refer to the Kent E-G-Y Test which, according to
the Smithsonian National Museum of American History, is a short form of
intelligence test designed to be given orally in emergency situations.  See
Smithsonian Nat. Museum Am. Hist.,
https://americanhistory.si.edu/collections/search/object/nmah_692505 (last
visited Oct. 6, 2022).  The record reveals that plaintiff was checked into
the Keystone Treatment facility while actively still high on methamphetamine,
which may have impacted the validity of the purported IQ score.  T356, 358.
Plaintiff does not allege an intellectual disability in these proceedings.

and 2015.  T353.  The mental status examination showed she was cooperative, had logical thought process, was tearful, had appropriate speech and affect, was fully oriented, and she denied hallucinations, delusions, obsessions, compulsions, phobias, or suicidal ideation.  T352.  She was spending $600 a week to support her drug abuse.  T354.

Ms. C. was seen at Sanford Family Medicine on May 22, 2017, to follow-up on her anxiety and migraines and she was taking Celexa for her anxiety, and Imitrex and propranolol for her migraines.  T380.  Ms. C.'s migraines were intractable migraine, unspecified type.  Id.  No objective findings were recorded from this examination.  T381.

Ms. C. relapsed and began using methamphetamine again in 2017.  T457.  Thereafter she again entered another eight-week substance abuse program at Keystone.  Id.

Ms. C. contacted Sanford Family Medicine on August 14, 2017, and requested a letter stating she had migraines because she had been missing some of her morning meetings at Keystone due to migraines.  T379.

Ms. C. contacted Sanford Family Medicine on May 21, 2018, and requested a letter for her court hearing stating that she was applying for disability and her doctor thinks it is appropriate.  T377.  Dr. Stephanie Broderson, M.D. said Ms. C. had a number of health/mental problems over the years, but the doctor stated  "I can't legitimately say I agree/think it is a good idea" for Ms. C. to apply for disability.  Id.  Dr. Broderson previously noted on May 10, 2018, that Ms. C.'s medical problems were stable.  Id.

8

Ms. C. was seen at Sanford Family Medicine on July 17, 2018, to follow-up on her anxiety and migraines, and she had been seen two months earlier for a migraine.  T376.  She reported increased migraines due to heat and humidity.  Id.  The only objective findings were that she was in no apparent distress, well developed and well nourished, alert and cooperative.  Id.

Ms. C. contacted Sanford Family Medicine on August 30, 2018, and reported increased anxiety attacks and that valium was not helping.  Id.  She asked about other medication, but with her history the doctor was not comfortable increasing benzo, so Seroquel, Celexa, Buspar, and hydroxyzine were discussed.  Id.

Ms. C. has had an extensive history with substance abuse and her accounts of that history vary according to who plaintiff was reporting to.  T456, 555-56.  She began using alcohol, LSD and methamphetamine in high school (T456), or she only used methamphetamine for one year (T555); she began using MDMA, GHB, and cocaine quite a few times in college (T456) or since she was 11 years old (T555); she used marijuana from college until approximately 2017 (T456); and she was addicted to opioids (T456).  Although plaintiff went through treatment for opioid addiction in 2006, she continued using opioids up through the 2014 pregnancy with a son, which did not result in a live birth.  T456, 551.  In addition, Dr. Broderson prescribed amphetamines for a period of years for plaintiff for a purported ADHD condition (T440-52), but no mental health expert had ever diagnosed plaintiff with ADHD.  See T555.  Dr. Broderson ceased prescribing amphetamines for plaintiff when plaintiff

informed her of her methamphetamine abuse in July 2016.  T389.  Plaintiff

also took Valium for five years and Ambien for 10 years on and off.[4]  T556.

Ms. C. was seen at Sanford Family Medicine on November 27, 2018, to

follow-up on her anxiety and migraines.  T371.  She reported racing thoughts,

feelings of losing control, and difficulty concentrating.  Id.  Ms. C. had

previously been treated with benzodiazepams, SSRI, and Seroquel, but was

currently unable to afford medication and she had applied for disability.  Id.

Ms. C. was unable to afford any preventive medication for her migraines, but

was taking sumatriptan for acute relief, and reported three migraines per week.

T375.  Her general appearance was alert and in no distress, and she was

cooperative.  Her gait was normal and cranial nerves were intact and full.

T374.  Her assessments were Anxiety, Mood Disorder, and Migraine without

status migrainosus, not intractable, unspecified type.  Id.  A SSRI was

prescribed with possible Benzo as needed, and counseling recommended.  Id.

It was noted that plaintiff would work with pharmD to obtain affordable

medications, patient assistance, and other services.  Id.

Ms. C. was seen for a consultative exam with psychologist, Dr. Emily

Blegen, on June 14, 2019, at the request of the State agency.  T455.  Ms. C.

was interviewed and Dr. Blegen recorded behavioral observations and results of

the mental status examination.  T455, 459.  Dr. Blegen stated the criteria for

pervasive depressive disorder were met with symptoms of hopelessness,

loneliness, isolation, feeling sad, shaking episodes, indecisiveness, and

---

[4] This paragraph has been inserted by the court.

disputed sleep.  T455.  Dr. Blegen stated the criteria for PTSD were met with anxiety symptoms of feeling emotionally overwhelmed consistently, anxiety about leaving the house, not wanting to be around others due to feeling she is not good enough, intrusive memories of abuse multiple times per day, strong negative self-belief, feeling of self-blame, avoiding other for fear whatever she says will get to her ex-husband who will use it to threaten her, hypervigilance, feeling jumpy and difficulty concentrating.  T456.  Dr. Blegen stated Personality Disorder was also indicated due to functionally impairing pattern of excessive emotionality and submissive behavior.  Id.

Ms. C. reported to Dr. Blegen that her migraines were occurring three times per week and could last 3-4 days without relief, or she might get relief with medication, but she is only allowed nine pills per month.  Id.  She said her migraines affect her mood and exacerbate her depression.  Id.  Ms. C. reported trying work at a cleaning job in April 2018 but her ex-husband came over the night before and beat up his dog in front of her and threatened to kill her. T457.  She tried a job at Homewood Suites obtained through a friend but became anxious when her friend's roommate's brother was making fun of her and telling her she was a loser.  Id.  She tried another cleaning job and completed training but "could not be around happy people."  T457-58.  Ms. C. reported that when she thinks about working, she becomes overwhelmed, gets scared and sick to her stomach.  T458.

Dr. Blegen recorded behavioral observations and results of the mental status exam revealed she had appropriate attention to dress and grooming,

there was some fidgeting seen for hand wringing and rocking a few times but there was no psychomotor agitation nor abnormal fine motor movements. T459.  She had good eye contact, there was no pain behaviors and ambulation was unassisted and at an appropriate speed.  Id.  She had mildly slow speech and reading that did not interfere with expression, prosody or articulation and had normal spontaneity and volume, no language deficits, moderately dysphoric and mildly anxious mood, affect was congruent to mood, frequent crying episodes appropriate to questions, moderately deficient social judgment and normal insight.  Id.  She had normal alertness, attention, concentration, orientation, social skills, and effort, there was no confusion, eye contact was good, hearing was normal, processing speed started as normal then progressively slowed associated with mental fatigue, pace mildly below expected level especially for performance-based tasks at the end of the appointment, moderate intolerance to stress of appointment, tiredness halfway through appointment with slow progression associated with mental fatigue and cognitive inefficiency and was otherwise normal persistence.  T459-460.  She had average fund of knowledge, good remote memory, no perceptual disturbances or abnormal thought content, thought process was logical, linear and without loose associations, she could follow directions normally and could carry out one-and two-step instructions and fill out the paperwork.  T459.  She had normal attention span, working memory, and ability to write, spell, and perform basic math and verbal reasoning.  T459-60.

12

Ms. C. was seen for a consultative exam with physician William Young, M.D. on August 6, 2019, at the request of the State agency.  T466.  Ms. C. reported a history of migraines back to 2003 and had been treated with opiates and became addicted.  Id.  She said that in June she was getting headaches about one time per week lasting two days.  Id.  Ms. C. reported trying prophylactic medicines including Topamax, Propranolol and Nortriptyline without success.  Id.  She was currently taking Imitrex about nine pills per month for abortive therapy, and propranolol for high blood pressure and for migraine prophylaxis.  Id.  Ms. C. reported that she had used FMLA for migraines and anxiety consistently for her jobs in the past.  T467.

Dr. Young's assessments included chronic migraines, PTSD, and other psychological comorbidities.  Id.  She is on medication that seems to be helping, but she reported difficulty leaving the house and functioning during the day.  Id.  Dr. Young stated that if her migraines were intimately tied to her PTSD then medical management may not be effective, but he noted that there are other options she has not yet tried, such as Botox therapy and a neurology consult.  T467-68.  Dr. Young stated her physical exam was normal, and the severity of her migraines was difficult to assess as she was not experiencing a migraine at the time.  T468.  Dr. Young stated Ms. C.'s prognosis is not likely to change much over time, she is going to deal with her mental issues for the rest of her life.  Id.  Dr. Young stated the issue of whether she can psychologically get through the workday is her main barrier.  Id.  Dr. Young

suspected Ms. C. would not have issues with standing, sitting, walking, stooping, climbing, or kneeling during the workday.  Id.

Ms. C. was seen at Sanford Family Medicine on September 5, 2019, to follow-up on her anxiety and migraines and her report that symptoms were not well controlled.  T568.

Ms. C. was seen at Sanford Family Medicine on October 10, 2019, to follow-up on her depression, anxiety and migraines, and she reported increased anxiety and migraines.  T474.  Ms. C. was referred to psych and her Seroquel restarted.  Id.  The mental status exam showed she was alert and oriented with normal thought content, speech, affect, mood, and dress.  Id.

Ms. C. contacted Sanford Family Medicine on January 28, 2020, and requested an increased dosage of diazepam due to struggling with increased anxiety and panic attacks.  T471.  The doctor had referred Ms. C. to psych the prior October, but Ms. C. did not have health insurance so could not afford to see them.  T471-72. The doctor was reluctant to increase the dosage due to her history with controlled substances, and other medication adjustments were discussed.  T472.

Ms. C. was seen at Sanford Family Medicine on March 11, 2020, to discuss her medications.  T508.  Her Celexa and Seroquel dosages had been increased, but her symptoms got worse.  Id.  Her diazepam dosage was increased and she was referred to BHTT for a therapist.  Id.  She was in no apparent distress, well developed, well nourished, alert, and cooperative.  Id.

Ms. C. saw Ashley Termansen, LCSW-PIP (LCSW Termansen) on March 24, 2020, for her initial counseling session.  T644.  Ms. C. was taking medication for depression and anxiety and her past drug abuse was discussed. Id.  Ms. C. was observed to be cooperative, have flat affect, she was anxious, and had good eye contact.  T645.  Psychotherapy was recommended and planned.  Id.

Ms. C. saw LCSW Termansen on April 2, 2020, for counseling for her depression and anxiety and the treatment notes documented briefly that Ms. C. was struggling with feeling sad and fearful of others, feeling isolated and having difficulty trusting others, specifically when she is alone and has memories of past abuse.  T587.  Ms. C. observed to have flat affect, she was anxious, and had good eye contact.  Id.

Ms. C. saw LCSW Termansen on April 13, 2020, for counseling for her depression and anxiety and the treatment notes documented briefly that Ms. C. was struggling with feeling sad and fearful of others, feeling isolated and having difficulty trusting others.  T541.  Ms. C. prognosis was fair.  Id.  The counseling note did not document a mental status exam.  The counselor met with Ms. C. to help her increase identification, expression, and differentiation of her feelings, to help her identify conflicts from the past and present that form the basis for her anxiety, to help her increase her self-confidence and thereby reduce anxiety, and to provide interpersonal therapy and/or EMDR[5] exploring

---

[5] EMDR stands for eye movement desensitization and reprocessing and is a psychotherapy that enables people to heal from the symptoms and emotional

relational interactions, attribution of responsibility, and her tendency to personalize others' emotions.  T541-42.

Ms. C. continued counseling with LCSW Termansen from her initial appointment on March 24, 2020, to the last appointment in the appeal record on February 8, 2021.  T581-784.  During that time Ms. C. had approximately fifty-eight therapy session of approximately one hour in length.  Id.  The therapy notes are generally brief and Ms. C. fear, distrust, nervousness, and anxiety symptoms are mentioned throughout.  Id.  The therapy notes include no documented mental status exams or mental observation details except for the March 24, 2020, (T645), and April 2, 2020, (T587), notes that she had good eye contact, was anxious, had a flat affect, and was cooperative.  Id.

Ms. C. saw LCSW Termansen for therapy on May 26, 2020, and Ms. C.'s disability paperwork was discussed and she said she wanted to work and does not like trying for disability, but she knew she needed to find a way to support herself while she works to improve her ability to cope with her anxiety.  T624.

Ms. C. saw LCSW Termansen for therapy on June 25, 2020, and Ms. C.'s memory issues were reviewed and LCSW Termansen encouraged Ms. C. for her awareness that her drug abuse caused her memory issues.  T612.

Ms. C.'s treating counselor, LCSW Termansen, completed a Department of Social Services form on June 26, 2020, regarding Ms. C.'s physical and mental health issues.  T505.  Ms. C.'s diagnoses were depressive disorder,

---

distress that are the result of memories of traumatic events.  See EMDR Inst., Inc., https://emdr.com/what-is-emdr/ (last visited Oct. 6, 2022).

moderate with anxious distress, and PTSD.  Id.  Her prognosis was fair due to the severity of her symptoms and their impact on her daily life.  Id.  LCSW Termansen stated that Ms. C. could not work at that time because she needed to find appropriate coping skills to utilize to function and she is working with her doctor to find appropriate medications.  T506.

Ms. C. saw LCSW Termansen for therapy on October 22, 2020, and Ms. C. discussed how she was trying to focus on the positive and discussed her ability to help her daughter after a surgery and also how she was going to bring a water bottle to her daughter at school, and she felt positive she could do that. T653.

Ms. C. had a telemedicine visit with Sanford Family Medicine on November 18, 2020, because she was experiencing COVID symptoms.  T512.  It was noted her psychologist thinks she needs medication for bipolar disorder.[6] Id.  She was in no apparent distress, and was alert, well developed, well nourished, oriented and cooperative.  Id.  Ms. C. was referred to Sanford Psychiatry for evaluation, noting she had a complex history that needs to be considered.  T513, 544.  Her sertraline dosage was increased to 75 mg.  T513.

_____

[6] Although this statement is not clearly attributed to plaintiff in the notes, the court assumes this is a statement plaintiff made to Dr. Broderson.  No psychologist diagnosed plaintiff with bi-polar disorder in any record in the administrative transcript.  Prior to this November 2020 visit with Dr. Broderson, Dr. Blegen had evaluated plaintiff and did not diagnose bi-polar disorder.  T455-61.  CNP Nichole Johnson evaluated plaintiff in January 2021 and appeared to rule out bi-polar disorder because plaintiff did not describe ever having experienced periods of hypo/mania.  T550, 555.

Ms. C.'s treating counselor, LCSW Termansen, completed a Mental Medical Source Statement on January 14, 2021, and reported having met with Ms. C. one to two times per week since March 2020. T514. She identified Ms. C.'s symptoms as poor memory, poor sleep, personality change, mood disturbance, emotional lability, recurrent panic attacks, social isolation, blunt, flat or inappropriate affect, decreased energy, loss of interests, feelings of guilt, difficulty concentrating, suicidal ideation or attempts, intrusive thoughts of traumatic experience, and generalized persistent anxiety. T514-15. LCSW Termansen opined that Ms. C. had no useful ability to function on a sustained basis in most mental abilities needed for unskilled work, except she had some ability, although seriously limited, to make simple work-related decisions and to ask simple questions or request assistance. T516. LCSW Termansen stated Ms. C. also had a fair ability to interact with the public, maintain socially appropriate behavior, and to adhere to basic standards of neatness, but poor or no ability to understand and remember detailed instructions, carry our detailed instructions, set realistic goals of make plans independently, or deal with stress of semiskilled and skilled work on a day-to-day basis in a regular work setting. T517-18. LCSW Termansen also felt Ms. C. would miss work due to her impairments more than three times per month. T517. LCSW Termansen felt that Ms. C. had more than marked level of mental functional limitations in maintain social functioning, concentrating, and episodes of deterioration or decompensation in work. T519. LCSW Termansen identified symptoms and diagnoses related to her opinions of Ms. C.'s limitations but did not enter

18

explanations for her ratings in the spaces provided for such on the form.
T514-20.

Ms. C.'s treating counselor, LCSW Termansen wrote a letter on January 20, 2021, regarding her treatment of Ms. C. and her symptoms.  T548.  LCSW Termansen stated she had been meeting one to two times per week with Ms. C. since March 2020 and most of the meetings were via telehealth as Ms. C.'s physical and emotional symptoms of anxiety and PTSD make it difficult for her to leave home, and she did not have proper financial support for transportation to the office.  Id.  LCSW Termansen stated that Ms. C. says she wants to work and they have worked on the stress that working causes and how it exacerbates her illnesses.  Id.  LCSW Termansen identified symptoms of nervousness, negative feelings, crying, poor memory, fearful of others, appetite fluctuations, fatigue, sadness, irritability, stomach pain, headaches/migraines, social withdrawal, decreased self-confidence, and avoidance of social activities. Id.  LCSW Termansen stated these symptoms of Ms. C.'s depression, anxiety, and PTSD limit her ability to work or "hold steady employment."  Id.  LCSW Termansen stated they are working on coping skills but at that time she felt Ms. C. was unable to "hold" full or part-time work and she needed intensive outpatient treatment, including counseling, supportive cognitive behavioral and EMDR.  Id.  LCSW Termansen provided her contact information and stated "please do not hesitate to call me . . . or email me" if there were questions or concerns.  Id.

19

Ms. C. saw LCSW Termansen for therapy on January 25, 2021, and Ms. C.'s work history and struggle to hold a job due to her anxiety and panic attacks was discussed.  T726.

Ms. C. was seen at Sanford Psychiatry on January 28, 2021, for a psychiatric evaluation.  T550.  Ms. C.'s psychosocial history included being beaten, abused and neglected as a child, an alcoholic and abusive ex-husband, abusive boyfriend, and drug abuse.  T552.  Ms. C.'s current medications were dexamethasone, (migraine medication – see T564), diazepam (anxiety medication), sertraline, (SSRI depression medication, Zoloft), sumatriptan, (migraine medication, Imitrex), albuterol, mupirocin, minocycline, metoclopramide, (for nausea due to migraine – see T564), propranolol, (migraine medication), triamterene-hydrochlorothiazide, levonorgestrel, losartan, and chlorthalidone.  T553.  Ms. C. reported appetite changes, weight changes, sleep issues, low energy, panic and anxiety, fears leaving home, paranoia, crying spells, feelings of hopelessness, helplessness, worthlessness, guilt, regret, shame, sadness, grief, and loneliness, issues with focus/concentration including feeling distracted, forgetful, disorganized, irritability, loss of interests, and racing or intrusive thoughts.  T555.

Mental status exam revealed a rigid posture, no unusual movements and normal ability to maintain motion and position.  T556.   She had a guarded and cooperative behavior toward examiner, her mood was anxious, affect was depressed, irritable and tearful, and she had delayed/hesitant speech.  Id.  She had adequate fund of knowledge and judgment/insight, intelligence

20

functioning was average, thought process was logical/realistic, organized and coherent, and thought content was goal directed and relevant.  Id.  Ms. C.'s diagnoses were moderate episode of recurrent major depressive disorder, PTSD, and personality disorder, and rule-out bipolar, OCD, and ADHD.  T550. Ms. C.'s Zoloft dosage was increased for anxiety and depression, Risperidone was prescribed at bedtime for help with racing and obsessive thoughts and depression.  Id.

Ms. C. had a history of using Valium for five years twice a day as needed, and a review of the dispensing showed use was less than daily until July 9, 2020, when it became consistently twice a day.  Id.  Reduction in Valium to once a day was recommended due to plaintiff's history of polysubstance abuse and because her anxiety and migraines were not well managed despite increased frequency of Valium use, but it was noted the Valium was also for her migraines so will defer to her primary care.  T550-51.

**E.      State Agency Assessments**

The State agency medical consultant at the reconsideration level reviewed the file on April 8, 2020, with medical evidence through January 28, 2020 (i.e., Exhibit 6F) in the file at the time, and found Ms. C. had a severe impairment of migraines, and non-severe hypertension.  T95, 97, 101, 469. The medical consultant found that Ms. C.'s symptoms of pain and limitations with social interaction were caused by her medically determinable impairments and her statements about the intensity, persistence, and functionally limiting effects of the symptoms were substantiated by the objective medical evidence

21

alone.  T99.   The medical consultant found Ms. C. could do medium exertion
work with some environmental limitations to cold, heat, and vibrations.  T100.

The medical consultant summarized that the evidence before him
indicated Ms. C. reported she had migraines that could last two to four days
and she has them one to two times per week, and she alleged she was not
"dependable."  T100.  The medical consultant stated, "Her migraines are
problematic."  T101. The medical consultant stated Ms. C. reported she can get
one to two migraines per week and without medication they can last up to five
days, they do not occur with severe neurologic dysfunction, she had not needed
ER treatment, and she could use long-acting medications to help with
prevention, however, there is some suggestion that her migraines may be in
part related to her mental disorders.  T100-01, 467-68.  The medical
consultant stated Ms. C. did not meet or equal any Listings.  T101.

The State agency psychological consultant at the reconsideration level
reviewed the file on April 5, 2020 with medical evidence through January 28,
2020 (i.e., Exhibit 6F) in the file at the time and found that Ms. C. had severe
impairments of depressive, bipolar and related disorders; personality disorder;
anxiety and obsessive-compulsive disorder; and trauma and stressor related
disorder.  T95, 97, 99.  The psychological consultant found that Ms. C.'s severe
mental impairments caused mild limitations in her ability to understand,
remember, and apply information; moderate limitations in her ability to
interact with others; moderate limitations in her ability to concentrate, persist

or maintain pace; and mild limitations in her ability to adapt or manage herself.  T98.

The psychological consultant noted the finding at the psychological consulting exam with Dr. Blegen that Ms. C. processing speed tended to slow when fatigued and found that it showed cognitive inefficiency associated with mental fatigue.  Id.  The psychological consultant noted that Dr. Blegen reported Ms. C.'s performance efficiency was compromised when under stress so she would do best if limited to settings where productivity is not a priority and she is not under time pressure, and she should have infrequent contact with the public.  T102.  The psychological consultant found that Ms. C. had a moderate limit in two categories: her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and to interact appropriately with the general public.  Id.  The psychological consultant found that Ms. C. had "no evidence of limitation" or was "not significantly limited" in the remaining eleven categories.  T101-02.

**F.        Evidence Submitted to Appeals Council**

Ms. C.'s treating counselor, LCSW Termansen wrote a letter on September 14, 2021, regarding her treatment of Ms. C. and her symptoms.  T8-9.  LCSW Termansen stated she had been meeting either in person or via telehealth one to two times per week with Ms. C. since March 2020.  T8.  LCSW Termansen stated that Ms. C. has needed to reschedule at times due to migraines.  Id.  LCSW Termansen said Ms. C. does have memory issues and noted that she does ask for things to be repeated.  Id.  LCSW Termansen stated

23

that Ms. C. does report head and neck pain, and she has observed that Ms. C. struggles with focus, concentration in conversation, forgetfulness, increased quickness to irritability, shutting down when she does not feel she can handle daily stressors, cries easily, and struggles to remember what she has discussed.  Id.  LCSW Termansen stated that Ms. C. gets "stuck" in her sadness or even numbness of her depression where she is not focusing on anything in particular and has periods where she does not get out of bed.  Id.

LCSW Termansen noted that planned EMDR therapy had been placed on hold because it can make migraines worse.  Id.  LCSW Termansen stated that when Ms. C. worked for Call to Freedom the majority of the therapy sessions were spent preparing her physically and mentally to go there, and Ms. C. was able to identify her desire to work, and how she felt the job would be "easy", but she did not understand her struggle to complete the job, or to leave home to go to the job at times.  T9.

## G.      Other Evidence

Ms. C. submitted work history related to her work at Sanford Health that documents on July 2012, FMLA was suggested to her due to being disruptive, lacking motivation, and her not working well with others, if she felt she had ongoing medical concerns.  T35.  Plaintiff did not take FMLA leave at that time, but six months later in January 2013, she took an undesignated two and a half months of leave and submitted an action plan when she came back for how she intended to fix her performance issues at work.  T36.  By June 2013 she had missed 17% of her shifts since April due to family troubles, no daycare, an ill

24

child, a doctor appointment, and some instances of being ill herself.  Id.  She was placed on "Decision Making Leave" which was the final step in the discipline process.  T37.  Discipline was warranted due to plaintiff posting on Facebook while at work, ignoring patient calls and machine alarms, denying she had had training on setting up a PD cycler when she had, not getting her work done, and not clocking out when she left for lunches or appointments.  T36.

Ms. C. submitted work history related to her work at Call To Freedom dated July 23, 2020, that documents she was placed on a Corrective Action Plan due to poor attendance, due to missing work, being late because of being unable to work, child care problems, migraines, and some other meeting.  T38. Ms. C. had already had previous disciplinary actions or warnings.  Id.  Ms. C. was not coming to work and failed to attend the scheduled improvement meeting, so she was no longer allowed to participate in the work program.  Id.

The State agency SGA Determination Report stated Ms. C. tried working at Moes in 2016 and earned $33.25, Center Inn in 2017 and earned $167.50, Cleaning by Judy in 2017 and earned $398.42, and AAA Cleaning in 2018 and earned $15.00.  T249.

In a Function Report Ms. C. completed as part of her disability application on March 5, 2019, she reported having one migraine per week lasting two to four days with lost vision on her left side, severe nausea, dizziness, sensitivity to light, vomiting, and throbbing.  T252-53.  She stated she spends time in a dark room, is limited as to the amount of Imitrex she can

25

take, and when having a migraine, she does not care or perform personal care. T252.  Ms. C. stated she has panic attacks with her heart pounding and inability to focus or rationalize.  Id.

In a Headache Questionnaire Ms. C. completed as part of her disability application she stated she had one to two headaches per week, caused by stress or unknown, and they start with neck pain, blurred vision, stomach upset, she must lay down and take Imitrex or ibuprofen, and they can last two to four days unless the meds stop it.  T262.  Ms. C. stated she had high blood pressure so she could only take nine Imitrex per month.  Id.  Ms. C. explained she lays down in a dark room and afterwards her neck and face muscles feel like she banged her head on a wall, and she feels "slowed" and can't concentrate.  Id.  When asked if she was seen in the ER in the last year for her headaches Ms. C. said she "tough it out since no insurance or money to get help as often as I'd like."  Id.

Ms. C. submitted a statement regarding her headaches with hand notated calendars showing when she had headaches.  T264-281.   The 2017 calendar indicates multiple migraines per week, (T264), monthly calendars from August 2018 to July 2019 indicate two or more headaches weekly. T265-276.

## H.      ALJ Hearing

Ms. C.'s hearing was held strictly by telephone due to Covid-19 and she was represented by a non-attorney representative.  T41.

26

1.    **Ms. C.'s Testimony:**

Ms. C. testified that she stopped working as a nurse due to absences from migraines, anxiety and PTSD with problems managing herself from her emotions at work.  T46.  She said she was not keeping up with her duties at work and had trouble concentrating.  Id.  She said she was missing one to two days per month at her last nursing job, but had a leave of absence for anxiety and migraines on the prior job.  T47.  Ms. C. testified that she had tried housekeeping, work in a hotel, work at a restaurant, and cleaning, and she could not follow through with going to work due to panic attacks and migraines.  T47-48.

Ms. C. testified she was having migraines ten days a month and then she had recovery days also.  T48.  Ms. C. only gets nine pills per month for migraines due to her hypertension.  T49.  Ms. C. said she had tried propranolol, Topamax, Imitrex, opioids, Lortab, and others and Imitrex was the only medication to help.  Id.

Ms. C. testified that her Valium makes her feel fatigued and drowsy, her Zoloft causes nausea, and her Risperdal causes her to feel kind of dazed and confused, kind of out of it.  T53.

Ms. C. testified she was not able to keep a schedule or routine due to the frequency of her migraines and panic attacks.  T55.

When asked if she had medical coverage Ms. C. said she was on Medicaid that started the prior summer and had no coverage before that.  T58.

27

### 2.   Vocational Expert Testimony:

The vocational expert ("VE"), was asked a hypothetical that reflected the limitations identified in the RFC determined by the ALJ, and the ALJ further clarified her hypothetical and stated the individual could do both simple and complex activities within a schedule so there is no limitation in terms of complexity of work.  T60-61.  The VE testified the individual could not perform any of Ms. C.'s past relevant work but there would be other jobs the individual could perform and identified occupations of hospital cleaner, linen room attendant, and housekeeping cleaner and provided the number of jobs available nationally and regionally for each occupation.  T61-62.

The VE testified that most employers would allow an individual to be absent one day per month, but absenteeism is not addressed in the DOT.  T62.

### DISCUSSION

### A.   Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole."  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)).  "[S]ubstantial evidence [is] defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion.' " Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "This review is more than a search of the record for evidence supporting the

[Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted). Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination. Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it. Minor, 574 F.3d at 627. The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings," the Commissioner must be affirmed. Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th

Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B.      The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.[7]  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

---

[7] Although Ms. C. has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only one applicable regulation where the corresponding regulation is identical.  It is understood that both Titles are applicable to Ms. C.'s application.  Any divergence between the regulations for either Title will be noted.

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step.  NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  Heckler v. Campbell, 461 U.S. 458, 460 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.  20 C.F.R. §§ 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.

31

> To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience. 20 C.F.R. § 404.1520(g).

## C.   Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D.   Assignments of Error

Plaintiff asserts two errors, one of which has four subparts.  First, she alleges the ALJ failed to properly evaluate her migraines at step three.  Second, plaintiff alleges the ALJ committed four errors at step four when formulating her RFC:  (1) the ALJ failed to properly evaluate her migraines, (2) the state agency consultants' opinions do not constitute substantial evidence supporting the ALJ's RFC determination, (3) the ALJ improperly rejected plaintiff's treating

physician's source opinion, and (4) the ALJ improperly evaluated plaintiff's mental RFC.  Docket No. 9 at pp. 1-2.

### 1.  Step Three—Migraines—Medical Equivalency

#### a.  The Applicable Law

When there is no specific Listing for an impairment, the Commissioner directs its ALJs to consult a Listing for a "closely analogous" impairment. Social Security Ruling (SSR) 17-2p, 2017 WL 3928306 *2 (3/27/17).  An individual is disabled at step three if the individual's impairment is at least of equal medical significance to those of a listed impairment.  Id.  Migraine headaches do not have a specific Listing, so the Commissioner directs its ALJs to consider the closely analogous Listing for epilepsy (Listing § 11.02).  SSR 19-4, 2019 WL 4169635 *7 (8/26/19).

Plaintiff asserts the ALJ in her case failed to analyze her migraines pursuant to the Commissioner's above directives.  Docket No. 9 at p. 1. Specifically, although the ALJ evaluated plaintiff's migraines as though they were epilepsy, plaintiff argues the ALJ *should have* evaluated plaintiff's typical headache events to determine if they *medically equal* the indicia for epilepsy. Id. at p. 5.  Had the ALJ properly evaluated plaintiff's migraines, plaintiff asserts she would have met the Listing for epilepsy as a medical equivalency. Id.  Alternatively, plaintiff asserts her migraines coupled with her mental impairments would have medically equaled the requirements of Listing § 11.02.

The Commissioner asks that the step three decision of the ALJ be affirmed.  Docket No. 11 at p. 4.  The Commissioner notes the discrepancy

between the objective medical findings regarding the frequency, duration, and severity of plaintiff's headaches and plaintiff's subjective assertions regarding the same.  Id. at pp. 5-6.  The Commissioner argues the ALJ properly concluded plaintiff's subjective allegations regarding the impact of her migraines were not entirely consistent with the record, especially her work activity after the alleged onset of disability date.  Id.  Furthermore, the Commissioner argues plaintiff did not comply with her prescribed treatment for migraines and, although she asserted she had a lapse in health insurance, she failed to show that there were no free or low-cost alternative medical services available.  Id. at p. 7.

At step three, if a claimant has an impairment that is not described in the Listings, the ALJ must compare the findings from the claimant's impairment to the most closely analogous listed impairment.  20 C.F.R. § 416.926(b)(2).  In doing so, the ALJ must consider all the evidence in the case regarding the impairment and its effect on the claimant, including opinions by designated medical consultants.  20 C.F.R. § 416.926(c).  A claimant's subjective statements about their symptoms, including pain, are considered, but they cannot by themselves establish disability.  20 C.F.R. § 416.929(a).  Subjective complaints must be supported by "objective medical evidence from an acceptable source" showing that the claimant has "a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged."  Id.

The ALJ does not give special weight or deference to medical opinions from treating sources.  20 C.F.R. § 416.920c(a).  Instead, *all* medical opinions are evaluated according to how the medical source supported their opinion with objective medical evidence and supporting explanations and how consistent the medical opinion is with the evidence from other medical and nonmedical  sources.  20 C.F.R. § 416.920c(c)(1) & (2).  Other factors considered in evaluating the weight to give a medical source opinion are the length of the treating relationship, the frequency of examinations, and the purpose of the treatment.  20 C.F.R. § 416.920c(c)(3).

### b.    The ALJ's Decision

The ALJ stated it had considered all of plaintiff's impairments individually and in combination to determine if they met or medically equaled a Listing.  T21.  Following the dictates of SSR 19-4p, the ALJ evaluated plaintiff's migraine impairment under the epilepsy Listing § 11.02 and found that plaintiff's impairment did not meet or medically equal that Listing.  T21-22.

The ALJ then considered plaintiff's mental impairments (depression, anxiety, personality disorder, and PTSD—T21), "singly and in combination" and found that plaintiff's impairments did not meet or equal the criteria of Listings §§ 12.04, 12.06 12.08 or 12.15.  T22.  In making this evaluation, the ALJ considered plaintiff's migraine impairments in combination with her mental impairments ("claimant has alleged experiencing migraines, depression, anxiety, PTSD and other impairments that affect her memory, concentration, and ability to complete tasks").  T22; ("claimant has complained of migraines,

35

depression, anxiety, and PTSD that affect her abilities to concentrate, finish tasks, and understand and execute instructions.") T23.  Despite considering *all* plaintiff's impairments in combination, the ALJ found plaintiff's impairments did not meet or medically equal any Listing.  Id.  The ALJ considered both Paragraph B and Paragraph C criteria under the mental impairment Listings and found plaintiff satisfied neither paragraph.  T22-23. In so concluding, the ALJ noted that no acceptable medical source had opined that plaintiff's impairments met or medically equaled any Listing.  T23.

### c.   The Record Evidence

The record regarding Ms. C's migraines is a checkered one.  She claims to have experienced migraines at a debilitating level since 2003.  This would have been right after she graduated college with her four-year bachelor's degree in nursing.  For the years 2003 to 2010, Ms. C. worked at the Nevada Cancer Institute Foundation and made $71,000 her last year there.  She moved to South Dakota in 2011 and went to work for Sanford Health, but that same year she began using methamphetamine.  T466.

She testified at the hearing before the ALJ that she lost her job due to excessive absenteeism from her migraines and mental impairments (T46), but the records in evidence do not support that testimony.  Ms. C. was arrested on criminal drug charges in June 2016 (T354), and three months later began substance abuse treatment at Keystone (T356).  Upon admission to treatment at Keystone in September 2016, Ms. C. told treatment providers she had been fired from her job for excessive absenteeism due to her drug use.  T354.  She

36

told Keystone that she would call in sick to her employer.  Id.  After going through treatment and remaining sober for a time, plaintiff relapsed in 2017 and began using methamphetamine, prompting a second eight-week substance abuse treatment program which left plaintiff "horribly depressed."  T457.

Employment records from Sanford from 2012 and 2013 (prior to the alleged date of onset of disability) demonstrate that plaintiff was fired for a variety of reasons including posting on Facebook while at work and failure to provide an action plan to address deficiencies in her work performance.  T35-36.  Sanford also identified excessive absenteeism as a cause for terminating Ms. C.'s employment, but that absenteeism was attributed to family troubles, not having daycare for her child, having an ill child, and attending doctor's appointments as well as some instances of Ms. C. herself being ill.  T36.  Plaintiff told Dr. Blegen that she was let go because her employer was inflexible with regard to daycare issues.  T457.

Plaintiff was fired from CTF in July 2020 for absenteeism, but again, not having childcare was one of the reasons for plaintiff's absences as well as giving inadequate notice (six minutes' notice) that she would not be at work or meetings.  T38.  Plaintiff's medical records from 2020 demonstrate that she was not complaining of migraines at this time to the only doctor who was treating her for that condition.  T527-30, 578.  The only complaints of migraines in plaintiff's counseling records are October 29, 2020; January 7, 2021; and January 14, 2021.  T732, 738, 780.  Plaintiff told her counselor that she used her migraine medication and it helped.  T732.

Ms. C. alleges a disability onset date of December 15, 2015, and records of all her prescribed medications from 2014 through 2021 are in the record. See T436-52. The first record that medications for migraines were prescribed for Ms. C. on August 28, 2014 for Imitrex (sumatriptan). T399, 440, 444. Ms. C. saw her doctor multiple times over the three months between June and September 2015 and did not complain of migraines at those visits. T399-405.

On September 7, 2015, she phoned her doctor asking for a refill of Imitrex, the medication she testified was the only effective migraine medication. T399. Records show that Ms. C.'s previous prescription for Imitrex had been issued over a year before (August 28, 2014), at which time she was given thirty tablets with five refills, a total of 150 tablets. Id. Ms. C. did repeatedly request and receive refills of Ultram/tramadol, another medication she was using for migraines between June and September. T391, 393-95, 399.

But what is significant is that Ms. C. testified at the hearing before the ALJ that Imitrex is the only medication that helped her migraines. T49. She testified that she was limited to using nine Imitrex pills per month because of her hypertension. T49. That means she could use up to 108 tablets per every twelve months. The records show the following regarding Imitrex prescriptions for plaintiff:

| Date | Amount Given | Total Tablets | Record Support | Monthly Rate of Consumption |
|------|--------------|---------------|----------------|------------------------------|
| 8-28-2014 | Amount not listed | | T339-440, 444 | unknown |

| 9-8-2015 | 30 tablet Rx with 5 refills | 150 tablets | T446, 438 | 16 tablets[8]/mo |
|---|---|---|---|---|
| 8-8-2016 | 30 tablet Rx with 1 refill | 60 tablets | T437, 449 | 6 tablets/mo |
| 3-28-2017 | 6 tablet Rx with 5 refills | 30 tablets | T437, 450 | 2 tablets/mo |
| 5-17-2018 | 6 tablet Rx with 5 refills | 30 tablets | T436, 441 | 9 tablets/mo |
| 9-1-2018 | 30 tablet Rx with 5 refills | 150 tablets | T441 | 13 tablets/mo |
| 9-5-2019 | 6 tablet Rx with 5 refills | 30 tablets | T537 | 3 tablets/mo |
| 10-2-2020 | 6 tablet Rx with 5 refills | 30 tablets | T529, 536 | Unknown—next refill not in record |

The records show that over long periods of time plaintiff was not using Imitrex even at the nine-tablet-per-month level. Since Imitrex is the only medication that worked for Ms. C., and since she appears to have consumed far less Imitrex for long periods of time than she was allowed, the inference is that she was not having migraines as often as she testified to, particularly in 2016, 2017, and 2019. Nor could this be an issue of affordability, as the record demonstrates that plaintiff was regularly consuming and obtaining refills of other medications, most notably Valium.

The first mention of anxiety in these records is a July 13, 2016, record in which Ms. C. told her doctor she had been arrested for using methamphetamine (though she denied using the drug) and that her husband had taken her kids and filed a restraining order against her. T389. There was

---

[8] There are no records showing whether plaintiff actually availed herself of the full number of refills the doctor authorized for her.

no mention of migraines in this record.  Id.  Ms. C saw her doctor multiple times between July and October and no mention of migraines is found nor did Ms. C. seek a refill of any of her migraine medications during this period. T384-89.

Ms. C. sought a refill of tramadol on October 3, 2016.  T383-84.  She was told at this time to see neurology for her migraines, but she did not keep her appointment with neurology.  T382.  The doctor told Ms. C. she would have to come in and see the doctor before the refill would be authorized due to Ms. C.'s "no show" at her October 17 neurology appointment.  T381-82.  An appointment was made for Ms. C. to see her primary care physician on December 5, but there is no record of an office visit that day, so it is assumed she did not keep the appointment.  Id.

Ms. C. did not seek medical care from her doctor again until March 28, 2017, approximately six months after her last phone contact and many more months after her last in-person visit.  T381.  At this time the doctor authorized a refill of Ms. C.'s Imitrex, propranolol, and Valium.  Id.

On August 14, 2017, Ms. C. called her doctors asking that they provide her with a letter documenting her migraines so that she could provide the letter to Keystone to explain her absences from drug treatment.  T379.

Her next visit with her doctor was not until nine months later on May 10, 2018.  T377.  Her medical problems were all noted to be "stable" at this time. Id.  Ms. C. reported no anxiety, depression or psychosis at this time.  T378. Although it was noted she had a history of non-intractable migraines, she did

not complain of migraines on this visit.  Id.  The doctor prescribed Inderal for migraines and hypertension.  Id.  A few days later Ms. C. phoned and asked for a refill of her Imitrex prescription.  T377.

It was at this juncture that Ms. C. phoned her doctor and asked for a supporting letter for her disability application.  Id.  The doctor responded "I can't legitimately say I agree/think it is a good idea" to apply for disability.  Id. This is significant since Ms. C.'s primary care physician saw her the most frequently of all the medical sources in the record, had the longest treating relationship with Ms. C. of all the medical sources, and treated her for all her impairments including her migraines and mental impairments.  T466.

At a follow-up doctor appointment July 17, 2018, Ms. C. reported doing well.  T376.  On August 30, 2018, Ms. C. phoned her doctor's office wondering "about some counseling stuff" and indicating her anxiety and migraines were not being controlled.  T375-76.  She suggested perhaps the doctor should prescribe Ativan for her.  T376.

Ms. C. was seen in her doctor's office on November 27, 2018, after she had called to discuss her migraines and anxiety, stating she was having three migraines per week.  T375.  She reported not taking any anxiety medications at present and not taking any preventive medications for her migraines, for which she requested prescriptions.  Id.  After an examination, Ms. C.'s doctor recommended she resume taking migraine preventative medications.  T374. Dr. Broderson renewed plaintiff's prescription for Imitrex two months earlier, giving her a thirty-tablet prescription with five refills (a total of 150 tablets), so

41

there would have been no need to "give" plaintiff a prescription for Imitrex in November—she already had access to Imitrex in sufficient quantities, but apparently chose not to take it. T441. Again, plaintiff was regularly filling other prescriptions during the fall of 2018, so cost does not seem to have been the motivation for not taking Imitrex.

The doctor discussed injectable migraine medications like Emgality but told Ms. C. she would not be able to get those injections without insurance. T481. Ms. C. told her doctor she was applying for Medicaid and the doctor told her to let the office know when her Medicaid application was approved, and they could try the injectable medication. Id. Ms. C. testified she became eligible for Medicaid in the summer of 2020, but there are no records suggesting she availed herself of the injectable migraine treatment offered by her doctor. T58.

Ms. C next saw her doctor two and half months later, but did not complain of anxiety or migraines at that visit. T477-78. Ms. C. did not see her doctor again until seven months later in September 2019. T475-76. She told her doctor that her medications were not providing good control of her anxiety and migraines. T476. No changes in medications were made but all medications were refilled. Id. Ms. C saw her doctor again a month later and had not been taking her anxiety medication, though she reported no significant side effects. T474. The doctor recommended she restart her anxiety medication and also sent Ms. C. for a psychological evaluation for possible bipolar disorder. Id.

42

Several months later on January 28, 2020, Ms. C. phoned her doctor asking for an increase in her Valium dosage, stating that she was having increased anxiety.  T471.  The doctor did not want to increase Ms. C.'s Valium dosage because of her prior drug dependency issues, but suggested Ms. C.'s Seroquel dosage be increased.  T472.  Ms. C. rejected that offer and insisted on an increase in her Valium dose.  Id.  It was noted that Ms. C. did not see anyone after the psychological referral was made because she stated she could not afford to see them.  Id.

Ms. C. saw her doctor for a medication check on March 11, 2020, at which she requested an increased Valium prescription because she was anxious over a boyfriend who had assaulted her and was stalking her.  T578.

Ms. C. did not see her doctor until August 26, 2020.  T530.  She made no complaints about migraines or anxiety on this occasion.  Id.  On October 2, 2020, Ms. C. phoned her doctor asking that her Imitrex prescription be refilled; the last refill had been over a year earlier in September 2019.  T529.  Ms. C. saw her doctor via telemedicine on November 18, 2020, complaining of Covid-19 symptoms, but not complaining of anxiety or migraines.  T527-28.  The doctor again made a psychological evaluation referral.  T528.  On January 19, 2021, Ms. C. phoned her doctor asking for a refill of her decadron migraine medication.  T525.

A psychiatry appointment was made for Ms. C. on March 15, 2021. T558.  At that time, Ms. C. was evaluated by Nichole Johnson, APRN-CNP. T550.  CNP Johnson found Ms. C. to be well-groomed, and appropriate in her

43

general appearance and behavior.  T556.  She found Ms. C.'s attention to be within normal limits and her concentration good.  Id.  Her memory/recent memory was good.  Id.  Her thought processes were logical, realistic, organized and coherent.  Id.  Her thought content was goal directed and relevant.  Id.

The ALJ noted that plaintiff told Emily Blegen, Psy. C., on the occasion of her consultative examination that she had lost her last full-time job due to her employer's lack of flexibility regarding plaintiff's childcare needs, not because her mental impairments or migraines interfered with her ability to do the job. T22.  She also told Dr. Blegen that she had no difficulties getting along with others.  Id.

### d.    The Court's Conclusion as to Step Three

The court finds the above decision by the ALJ, contrary to plaintiff's assertions, correctly applied the law.  The ALJ considered whether Ms. C.'s migraines medically equaled the severity of the epilepsy Listing.  SSR 19-4p directs ALJs specifically to paragraphs B and D.  Paragraph B of Listing § 11.02 requires dyscognitive seizures occurring at least once per week for at least three consecutive months despite adherence to prescribed treatment. Listing § 11.02B.  Paragraph D requires dyscognitive seizure at least once every two weeks for three consecutive months despite adherence to prescribed treatment.  Listing § 11.02D.

A dyscognitive seizure is defined as one where there is an alteration of consciousness without convulsions or loss of muscle control, which may involve blank staring, change of facial expression, and automatisms such as lip

44

smacking or repetitive actions.  Listing § 11.02H1b.  This is difficult to translate into migraine symptoms, but simply on the basis of the Imitrex prescriptions—or lack thereof—the court can conclude Ms. C. did not have migraines "despite adherence to prescribed treatment."  She herself testified that only Imitrex helped her migraines, that she was able to take up to nine tablets per month of Imitrex, but she was not using Imitrex regularly and sometimes not at all.  She was not adhering to prescribed Imitrex treatment.  Furthermore, there is evidence in the record that plaintiff voluntarily discontinued migraine preventative medication against her doctor's instructions.  T374-75.

It is also significant that Ms. C.'s physician recommended an injectable treatment for migraines when Ms. C. went on Medicaid.  T481.  Ms. C. went on Medicaid in June 2020, and medical records for Ms. C. continue through early 2021, yet there is no evidence Ms. C. ever followed up and obtained this recommended treatment.  Finally, Ms. C.'s primary care physician referred her to neurology for her migraines, but Ms. C. never kept her appointment with neurology.  There are no records in evidence that Ms. C. ever had to resort to an emergency room visit because she had a migraine that spiraled out of control.  The ALJ's step three decision based on consideration of migraines alone is supported by the record.

 The ALJ also considered whether plaintiff's mental impairments, alone or combined with her migraines, met or equaled any of the mental impairment Listings.  In reaching this decision, the ALJ considered all the evidence—

45

consultative medical source opinions, plaintiff's reports of her own daily functioning, and plaintiff's own description of her symptoms.  T22-23. For plaintiff to be considered disabled from a mental impairment at step three, she must demonstrate that she meets either paragraph B criteria or paragraph C criteria.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A2) (1989), Listings §§ 12.00, 12.04, 12.06 and 12.15.  The ALJ concluded that plaintiff did not meet either the paragraph B or paragraph C criteria.  T22-23.

### i.  Paragraph B Criteria

To meet the paragraph B criteria, plaintiff must have demonstrated that her mental impairments and migraines resulted in at least one extreme or two marked limitations in one of the following broad areas of functions:

- understanding, remembering, or applying information;

- interacting with others;

- concentrating, persisting, or maintaining pace; or

- adapting or managing themselves.

Listing §§ 12.00.A.2.b and 12.00.E.

The ALJ found only mild and moderate limitations in the paragraph B criteria.  T22-23.  Specifically, the ALJ found plaintiff had "mild" limitations in understanding, remembering, or applying information, and adapting or managing oneself.  Id.  The ALJ found she had "moderate" limitations in interacting with others and concentrating, persisting or maintaining pace.  Id.

An "extreme" limitation is "the inability to function independently, appropriately or effectively, and on a sustained basis."  Listing § 12.00.F.2.e.

46

A "marked" limitation means that one's ability to "function independently, appropriately, effectively, and on a sustained basis is seriously limited." Id. at §12.00.F.2.d.  A "moderate" limitation means the claimant has a "fair" ability to function in the area independently, effectively and on a sustained basis.  Id. at § 12.00.F.2.c.  A "mild" limitation means the claimant is only "slightly limited" in their ability to function independently, effectively and on a sustained basis in the area.  Id. at § 12.00.F.2.b.

The ALJ noted that Dr. Blegen found plaintiff to have normal memory and concentration upon examination in June 2019.  T22.  On this occasion plaintiff demonstrated adequate reading, math skills, and she interpreted proverbs.  T22.  Dr. Blegen's findings were repeated in CNP Johnson's, evaluation of plaintiff's memory and concentration in January 2021.  T556.  The ALJ also noted that plaintiff was able to prepare quick meals, perform household chores, remember to take her medication, leave home unaccompanied, drive an automobile, shop in stores, handle her finances, and understand and execute written instructions.  T22.  Furthermore, plaintiff assisted her grandmother with errands and answered questions during the ALJ hearing, showing adequate recall.  Id.

Plaintiff told Dr. Blegen that she had no problems interacting with others.  T22.  She was able to go to a barbeque and records described plaintiff as cooperative, with normal mood and affect.  Id.  The ALJ noted that, although plaintiff complained that her migraines and mental impairments interfered with her ability to concentrate and finish tasks, her examination by Dr. Blegen

47

showed normal attention and concentration, both conversationally and in assigned tasks during the evaluation.  T23.  During her hearing, plaintiff followed the proceedings without any apparent difficulty and answered questions.  Id.

Neither the medical records nor plaintiff's daily ability to function support any finding of extreme or marked limitations.  Without a finding of an extreme or marked limitation, the ALJ was correct to conclude that the paragraph B criteria were not met.

### ii.    Paragraph C

To meet the paragraph C criteria, plaintiff must show that she had a "serious and persistent" mental disorder—i.e. one that was medically documented and lasted for at least two years.  Listing § 12.00.G.2.a.  In addition, the claimant must show that she met both paragraph C1 criteria and paragraph C2 criteria.  Id.

Paragraph C1 criteria requires showing that the claimant relies on an ongoing basis on medical treatment, mental health therapy, psychosocial supports or a highly structured setting to diminish the signs and symptoms of her mental disorder.  Id. § 12.00.G.2.b.  There is no evidence plaintiff was ever living in a highly structured setting except when she enrolled in substance abuse treatment in the fall of 2016.  She did not begin counseling until March of 2020, well over four years after she alleges she became disabled, and nearly two years after she applied for disability benefits.  This defeats the requirement

48

that the record demonstrate she is reliant on an ongoing basis on medical treatment, mental health therapy, or psychosocial supports.

Paragraph C2 requires the claimant to show that despite her diminished signs and symptoms, her adjustment is only marginal. Id. § 12.00.G.2.c. Marginal adjustment means the claimant's adaptation to the demands of daily life is fragile and she has minimal ability to adapt to changes or new demands. Id. Evidence such as the fact that a claimant had to be hospitalized, could not work, or was unable to leave her home are evidence of fragile and marginal adjustment. Id. There is one medical record showing that plaintiff was afraid to leave her home for a time due to anxiety, but there was a logical external reason for her fear: her boyfriend who had beat her up repeatedly was stalking her and threatening her. T578. The court finds the ALJ's decision that paragraph C criteria was not met is supported by substantial evidence in the record.

The Listings which are relevant to the step three inquiry are set at a very high level of severity. They are set that way for a reason: any claimant who can meet or medically equal a step three Listing is presumed to be disabled and that makes further inquiry into the claimant's age, education, vocational history or functional capacity unnecessary. Sullivan v. Zebley, 493 U.S. 521, 532 (1990). Ms. C. does not meet either Listing § 11.02 or the mental impairment Listings, either considering her migraines alone or in combination with her mental impairments. The court therefore affirms the ALJ's step three decision as supported by substantial evidence in the administrative record.

### 2. Step Four—RFC

Plaintiff asserts the ALJ improperly determined her RFC in four ways. First, she alleges the ALJ did not properly consider her migraine impairment when formulating her RFC. Second, she alleges the state agency medical consultants' opinions do not constitute substantial evidence to support the ALJ's RFC determination. Third, plaintiff argues the ALJ did not provide good reasons for rejecting her treating source opinion. Fourth and finally, plaintiff argues that the ALJ improperly determined her mental RFC.

### a. The Law Applicable to Determination of RFC

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered). "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability. 20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. Oct. 22, 2013). The formulation of the RFC has been described as "probably the most important issue" in a Social Security case. McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere. Lauer, 245 F.3d at 703; SSR 96-8p, SSA POMS DI 24510.006 (7/2/96). Although the ALJ "bears the

primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[9]  Lauer, 245 F.3d at 703 (citations omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p, SSA POMS DI 24510.006 *7 (7/2/96).  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted."  Id.

For cases filed after March 2017, like this one, medical opinions from accepted medical sources about the nature and severity of an individual's impairment(s) are evaluated according to how supported the opinion is by objective medical evidence and supporting explanations and how consistent the opinion is with other medical and nonmedical evidence in the record.  20 C.F.R. § 416.920c(c)(1) & (2).  Other considerations are the relationship the medical source had with the claimant, the length of their treatment

---

[9] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  See SSR 96-8p, SSA POMS DI 24510.006 (7/2/96).

relationship, the frequency of examinations, the purpose of the treatment relationship, the kinds and extent of testing or examinations, and whether the medical opinion is in an area in which the medical source has expertise or specialization.  20 C.F.R. § 416.920c(c)(3) – (5).

Acceptable medical sources include licensed physicians and psychologists.  20 C.F.R. § 416.902(a)(1) & (2).  It also includes licensed advanced practice registered nurses and physician assistants for issues within the scope of their licensed practice.  20 C.F.R. § 416.902(a)(7) & (8).

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ.  SSR 96-8p, SSA POMS DI 24510.006 *7 (7/2/96).  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations.  Id.  However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.  Id.

"Where there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  Id.  However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC."  Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . .  In assessing RFC, the adjudicator must

. . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p, SSA POMS DI 24510.006 *1 (7/2/96) ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").

### b.      The ALJ's RFC Formulation

The ALJ established the following as Ms. C.'s RFC:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(d) except that she could lift and/or carry 50 pounds occasionally and 20 pounds frequently.  She could stand and/or walk for about six hours out of an eight-hour workday.  She could sit for about six hours out of an eight-hour workday.  She could handle occasional exposure to extreme heat or cold or excessive vibration.  She could attend to, sustain concentration, and carry out simple and complex activities within a schedule.  She can meet the demands of a flexible and goal-oriented pace but cannot perform work at a production-rate pace or with very short deadlines.  She is limited to occasional contact with the public.

T23-24.

### c.      Whether the ALJ Properly Considered Migraines

Ms. C. claims the ALJ failed to follow the requirements for evaluating migraines in SSR 19-4p and that migraines did not figure into Ms. C.'s RFC at

all because there is no allowance for absences, concentration issues, the need for unscheduled breaks, being off task, needing to leave work early, or being unable to maintain pace.  Docket No. 9 at pp. 9-12.

SSR 19-4p states that when assessing RFC with a migraine impairment, "we consider the extent to which the person's impairment-related symptoms are consistent with the evidence in the record . . . Consistency and supportability between reported symptoms and objective medical evidence is key in assessing the RFC."  SSR 19-4p, 2019 WL 4169635 ¶9 *7-8 (8/26/19).

The ALJ recounted Ms. C.'s various statements about disabling pain from migraines (T24), but then concluded that her statements concerning the intensity, persistence and limiting effects of her migraines symptoms were "not entirely consistent with the medical evidence and other evidence in the record." T25.  The court agrees.  Referring again to the above detailed discussion of the medical evidence concerning Ms. C.'s migraines, they do not support her account of disabling pain.  Her seeking of medical interventions for help with her migraines was sporadic, especially her use of Imitrex, which she testified was the only drug that helped her migraines.  She never followed up with the suggested injection drug after she went on Medicaid.  She never followed up on her referral to neurology, despite the fact her primary care physician and staff made arrangements for Ms. C. to get financial assistance with her medical bills. There were months and months when she sought no medical attention at all or, when she did, she reported no issues with migraines.

Nor does the nonmedical evidence support Ms. C.'s account of disabling pain. She claimed at the ALJ hearing to have been fired due to absenteeism from frequent migraines, but she made statements elsewhere in the record that she was fired due to absenteeism arising from her illegal drug abuse. Employment records from Sanford and CTF show plaintiff was fired for a variety of reasons and that absences from illness were not the only or major factor in those employment decisions. Plaintiff is able to carry on the day-in, day-out tasks of caring for herself, managing her finances, maintaining her living space, cooking, driving, shopping, and caring for her daughters on weekends and even longer periods sporadically. She assists her grandmother daily. She performed normally on tests requiring attention, cognition and concentration.

The court agrees with plaintiff's counsel: it is taken as a given that Ms. C. suffers from migraines and that they are a severe impairment. The ALJ so found at step two. But the court agrees with the ALJ that Ms. C. exaggerated the impact those migraines have on her functional capacity.

The court notes that, at step three of the analysis, the ALJ found Ms. C.'s migraines and mental impairments to mildly limit understanding, remembering, and applying information and in adapting or managing oneself. T22-23. The ALJ found Ms. C. had moderate limitations in interacting with others and in concentrating, persisting, and maintaining pace. T22-23. There is no specific part of the ALJ's RFC that corresponds neatly to these mild and moderate limitations found at step three.

A finding at step three that a claimant has mental limitations does not "magically disappear when the analysis moves to step four." Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015). However, just because a limitation is found at step three also does not mean there automatically must be a corresponding functional limitation in the RFC formulated at step four. Id. Instead, the limitations found at step three should be considered when formulating RFC, but they do not "automatically translate into limitations on the claimant's ability to work." Id. The question is whether substantial evidence in the record as a whole supports the ALJ's RFC formulation. Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).

The ALJ considered all the medical opinions in evidence. Plaintiff emphasizes that one state agency consultant labeled her migraines "problematic." Docket No. 9 at p. 11. But the state agency consultant opined that Ms. C.'s migraines do not significantly limit her functioning. T99-101.

Plaintiff emphasizes a third consultive medical source, Dr. William Young, who speculated whether her migraines might be connected to her PTSD. Docket No. 9 at p. 11. But Dr. Young ultimately was unable to evaluate the severity of Ms. C.'s migraines because she had not been evaluated by a neurologist, there were unexplored treatment options, and Ms. C. was not experiencing a migraine at the time of her exam. T467-68. In short, there was no medical opinion by any medical source finding that Ms. C.'s migraines had a significant impact on her functioning. And, of course, the one physician who

knew plaintiff the best and had treated her migraines for the longest period of time declined to issue a letter supporting Ms. C.'s disability application.

There is no evidence in the record of Ms. C.'s need to have absences or leave work early due to migraines other than her own testimony. Neither the Sanford employment records nor the CTF records support this assertion. T35-38. The ALJ properly discounted Ms. C.'s testimony, both because of the lack of medical opinion supporting it and because Ms. C.'s daily activities did not support her own testimony. The court finds that the ALJ's RFC is supported by substantial evidence in the record as it concerns the evaluation of Ms. C.'s migraines.

### d.   Whether the State Agency Consultants' Opinions Were Sufficient to Support the ALJ's Decision

Plaintiff asserts that opinions of the state agency consultants, who never examined or treated plaintiff, cannot constitute substantial evidence supporting the ALJ's RFC determination. Docket No. 9 at p. 12. Furthermore, plaintiff asserts that the state agency consultants did not have the benefit of reviewing evidence found at T502-784 because those medical records were submitted to the agency *after* the state agency consultants issued their opinions on April 8, 2020. See T101. These records included plaintiff's counseling records, the opinion of plaintiff's counselor, and the initial psychiatric exam. Docket No. 9 at p. 13. Plaintiff asserts that opinions of state agency consultants who do not consider material evidence cannot constitute substantial evidence. Id. at p. 14.

The Commissioner argues that the Supreme Court and the Eighth Circuit have long held that an ALJ may rely on the opinion of state agency consultants along with the medical evidence as a whole in determining RFC. Docket No. 11 at p. 12. Furthermore, the fact that a consultant did not have all the records at their disposal when rendering an opinion does not preclude the ALJ from giving substantial weight to that consultant's opinion. Id. at p. 13. The Commissioner notes that the ALJ properly acknowledged that the consultants did not have all the evidence at the time their opinions were rendered. Id. Finally, the Commissioner notes that RFC is a determination reserved to the ALJ and the RFC arrived at in a particular case need not match any specific medical opinion. Id. at p. 14.

There were four agency consultant exams, two at the initial consideration level, and two at the reconsideration level, with one evaluating plaintiff's physical RFC and one evaluating her mental RFC at each level. T77-84, 87-93, 95-104, 106-15. The ALJ rejected both opinions at the initial consideration level, finding that the opinions were not consistent with the objective medical evidence. T26-27. However, the ALJ credited the two opinions at the reconsideration level, finding that they were consistent with the objective medical evidence and the plaintiff's daily functioning. Id.

The second agency consultant opined plaintiff's migraines existed and were severe, but plaintiff retained the RFC to perform medium work with environmental limitations. T26 (relying on T99-101). The other second agency consultant opined plaintiff's severe mental impairments resulted in moderate

limitations on her ability to interact with others and to concentrate, persist, and maintain pace.  T27 (relying on T102-04).  The second agency consultant opined plaintiff had mild limitations in the other domains.  T27 (relying on T102-04).  This consultant opined plaintiff could perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and interact appropriately with the public.[10]  T27 (relying on T102-04).

The ALJ specifically held that the second agency consultant's mental RFC opinion was supported by a psychiatric evaluation of plaintiff which was conducted just two months before the ALJ hearing in January 2021.  T27 (citing Exhibit 14F (T55-57)).  Therefore, even though the second agency consultant did not have the benefit of reviewing this later medical record, the ALJ considered the consultant's opinion in light of the later evidence and found them to be congruent.  T27.

Similarly, the ALJ stated that the second agency consultant's opinion was consistent with Exhibit 6F (pp. 4 & 6), Exhibit 8F (pp. 2, 4, & 6), Exhibit 16F (pp. 4, 19, 28, & 40), Exhibit 17F (pp. 7 & 10), and Exhibit 18F (pp. 13 & 37).  These are all exhibits plaintiff claims undermine the second agency consultant's opinion because the exhibits were not received by the agency until after the consultant's opinion was rendered.  Docket No. 9 at p. 13.  However,

---

[10] The consultant listed these skills as "moderately limited" and further notes "[Ms. C.] is limited to settings where contact with the public is infrequent." T102.

the ALJ *did consider* that evidence, weighed it against the state agency consultant's opinion, and found them to be consistent with each other.  T27.

As is evident from the above discussion, the ALJ did not rely solely on the state agency consultants' opinions in assessing plaintiff's RFC.  The ALJ found the consultants' opinions to be consistent with the other cited evidence in the record, much of which was filed with the agency after the state consultants' opinions were rendered.  Therefore, the ALJ's opinion cannot be said to be founded, as plaintiff argued, solely on the agency consultants' opinions.

The psychiatric evaluation conducted on plaintiff on January 28, 2021, and cited to by the ALJ as being consistent with the second consultant's opinion, found mostly normal indicia.  T556.  Specifically, plaintiff was well-groomed, showed appropriate behavior and normal energy.  Id.  Her posture was rigid, but her gait, station, musculoskeletal movements, and motor activity were normal.  Id.  She was cooperative and guarded toward the examiner.  Id.  Plaintiff's mood was anxious, depressed, irritable, and tearful and her speech delayed/hesitant.  Id.  Her association was intact and her intelligence, fund of knowledge, demonstrated insight, and judgment/insight were average or adequate.  Id.  Her thought processes were logical/realistic, organized and coherent.  Id.  Her thought content was goal directed and relevant.  Id.  These findings in January 2021 are certainly consistent with the agency consultant's April 2020 findings of mild to moderate limitations in plaintiff's mental functioning.

Exhibit 8F cited by the ALJ as consistent with the agency consultant's opinion are medical records from plaintiff's long-time general practitioner physician, Dr. Broderson. T507-13. On March 11, 2020, Dr. Broderson found plaintiff to be in no apparent distress, alert and cooperative. Id. T508. On August 26, 2020, Dr. Broderson recorded that plaintiff was in no apparent distress, alert and cooperative and specifically that she was alert, oriented to time, person and place with normal thought content, speech, affect, mood and dress. T510. On November 18, 2020, Dr. Broderson found plaintiff presented the same. T512. Again, although the agency consultant did not review these records, the ALJ did review them, did compare them with the consultant's opinion, and found them to be consistent. T27.

Exhibit 16F cited by the ALJ as consistent with the agency consultant's opinion are counseling records from plaintiff's counselor who she began seeing in March 2020. T588-646. The records reveal that plaintiff was seeking greater custody of her two daughters from her ex-husband in court, asking for 50/50 custody. T600. She felt confidence in herself as a mother. Id. On another day plaintiff had worked at CTF and "felt positive about this." T603. Later plaintiff obtained bunkbeds for her daughters at her house and attended a barbeque over the weekend. T606. At another counseling session, plaintiff spoke about how her drug use in the past has left her with memory issues. T612. Another counseling session demonstrated plaintiff's ongoing work. T615. Plaintiff expressed anxiety over an ongoing criminal case against her ex-boyfriend who assaulted her and the fact that she received messages that felt

61

threatening from him.  T621.  Plaintiff told her counselor she has her daughters on weekends.  T644.  In several sessions she expressed enjoyment over time spent with her daughters and that she enjoyed taking care of them and helping them with their homework.  T624, 630, 633.  On another occasion the counselor recorded plaintiff had flat affect, was anxious, but made good eye contact.  T643.

Exhibit 17F cited by the ALJ as consistent with the agency consultant's opinion are more counseling records from plaintiff's counselor.  T647-716. Plaintiff discussed that her prior drug use sometimes made her paranoid. T711.  Plaintiff expressed struggling to feel safe with regard to the abusive relationship she had left, and her counselor encouraged her to remember she had removed herself from that negative situation.  T708.  She expressed fear and anxiety and defeat after being fired at CTF.  T702.  Plaintiff told her counselor she felt her past drug abuse had intensified her depression and anxiety.  T699.  Plaintiff reported feeling sick from her new medications[11] and not wanting to leave her apartment over the weekend.  T693.  Plaintiff reported that she had had her daughter for a whole week and felt that was a positive development.  T684.  Plaintiff discussed discovering that she was being investigated by "the other party's lawyer" and how that increased her anxiety and isolation.  T669.  Plaintiff reported being sick, that she thought it was

---

[11] As a result of the psychiatric evaluation January 28, 2021, plaintiff's Zoloft dosage was increased and Risperidone was prescribed as a sleep aid.  T550.

something she caught from her daughter, and that she hoped it wasn't COVID.  T656.

Exhibit 18F cited by the ALJ as consistent with the agency consultant's opinion are more counseling records from plaintiff's counselor.  T717-784.  On October 29, 2020, plaintiff reported currently suffering a migraine headache.  T780.  In November 2020 plaintiff was tearful and upset because she had met with her lawyer who was handling the custody matter regarding her daughters and felt the lawyer had been dismissive.  T775.  In that same month plaintiff stated she was sad to have little money as the holidays approached and was fearful of leaving her apartment knowing that the people she was in a lawsuit against were watching her.  T772.  Plaintiff reported feeling negative and down because she was sick with COVID.  T769.

In December 2020 plaintiff reported feeling stressed over having to go to court and over her upcoming disability hearing.  T762.  In another December entry plaintiff expressed stress over her child support hearing the next day.  T756.  Plaintiff discussed feeling hopeful regarding classes for medical coding and billing.  T750.  Several times plaintiff described feeling positive, hopeful and confident.  See, e.g.  T741, 744, 738, 729, 726.  On January 7, 2021, plaintiff engaged in a therapy session though she reported she was "fighting" a migraine.  T738.  She discussed enjoying time with her daughters and feeling hopeful.  Id.  Plaintiff expressed anxiety over a criminal court case and over her upcoming disability hearing.  T735.  On January 14, 2021, plaintiff reported having a migraine but she used her medications and they were helpful.  T732.

63

In February 2021 plaintiff reported feeling sick and exhausted by all the litigation she is involved in and hopeful of finding closure with court trials.  T720.

The court concludes that the ALJ's RFC determination was not based solely on the agency consultants' opinions, that it was also based on plaintiff's own testimony in part, on plaintiff's daily functioning, and specifically on medical evidence in the record, both those records received prior to April 2020 and after April 2020.  Further, this court concludes that the ALJ's RFC determination is supported by substantial evidence in the record.

Plaintiff's counseling records reveal migraines only two or three times over eleven months where plaintiff saw her counselor weekly or more frequently.  Despite the migraines, plaintiff was able to engage in the counseling sessions and on one occasion she stated her migraine medications helped.  Overall, the counseling records show plaintiff was mainly seeking assistance with her past history of drug abuse and not wanting to relapse as well as working through anxiety from multiple litigations.  Plaintiff was involved in at least four separate forms of litigation during this period:  a criminal case in which she was the victim of an assault by her ex-boyfriend, a child custody dispute with her ex-husband, a child support proceeding, and this disability proceeding.  She understandably expressed anxiety and fear over these ongoing proceedings.  Such anxiety and fear provoked by litigation is entirely normal.  She expressed fear of leaving her house on two or three occasions, but that fear was provoked by normal catalysts:  her ex-boyfriend was out on bond and had

64

threatened her and another party she was opposite in litigation was known to be investigating and surveilling her.  The counseling records reveal that plaintiff was most frequently feeling confident, positive and hopeful and that she was taking care of her two daughters, ages 7 and 13 (in 2020) on weekends and at times for up to a week.  These records support the ALJ's RFC.

Likewise, the psychiatric evaluation on January 28, 2021, by CNP Johnson found mainly normal evidence with some mild impairments as did the psychological evaluation by Dr. Blegen in June of 2019.  T455-61, 550-57.  The court rejects plaintiff's argument that the ALJ's RFC was based solely on non-treating, non-examining opinions of agency consultants.

### e. Whether the ALJ Properly Rejected Plaintiff's Treating Source Opinion

On January 14, 2021, Ashley Termansen, plaintiff's licensed social worker (counselor), provided an RFC opinion.  T514-20.  The ALJ found this opinion "unpersuasive" both because Ms. Termansen is not an "accepted medical source" under agency regulations and because her opinion was inconsistent with the objective medical evidence in the record, especially Ms. Termansen's own treatment notes.  T27.  Plaintiff asserts this was error for the ALJ to reject her treating counselor's opinion and that the ALJ did not give "good reasons" for doing so.

Social Security regulations define an "acceptable medical source" as a licensed physician, licensed psychologist, licensed optometrist, a licensed podiatrist, a qualified speech-language pathologist, a licensed audiologist, a licensed advanced practice registered nurse, or a licensed physician assistant.

20 C.F.R. § 404.1502(a).  Licensed social workers, like Ms. Termansen, are not "acceptable medical sources."  Id.  A "medical source" is defined in pertinent part as "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law."  20 C.F.R. § 404.1502(d).  A "nonmedical source" is defined in pertinent part as "public and private social welfare agency personnel."  20 C.F.R. § 404.1502(e)(3).

Only an accepted medical source can diagnose or establish the existence of a medically determinable impairment through objective medical evidence. 20 C.F.R. § 404.1521.  But RFC is determined by considering all relevant evidence, including statements from "medical sources" who are not "acceptable."  20 C.F.R. § 404.1545(a)(3); 20 C.F.R. § 404.1513(a)(2).

Prior to March 27, 2017, an ALJ was generally required to give more weight to the opinion of a treating physician and to give "good reasons" for the weight the ALJ assigned to a treating physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).  After March 27, 2017, a new regulation was promulgated which is applicable to Ms. C.'s claim in this case.  See 20 C.F.R. § 404.1520c. Under the new regulation, controlling weight is no longer given to a treating physician's opinion nor is the ALJ required to give "good reasons" for the weight accorded to such an opinion.  Id. at subsection (b).

It is unclear to this court whether a licensed social worker is a "medical source" as plaintiff asserts.  The Commissioner's regulations define a "medical source" as a "healthcare worker" licensed by the State.  20 C.F.R.

66

§ 404.1502(d).  Under South Dakota law, social workers are licensed by a

Board of Social Work Examiners under the auspices of the South Dakota

Department of Social Services; licensure is not granted by a health or medical

board.  SDCL §§ ch. 36-26 (West 2022).  In order to qualify for licensure, a

certified social worker must have a doctorate or master's degree from a school

of social work and pass the board's examination.  SDCL § 36-26-14 (West

2022).  A licensed social worker must have a baccalaureate degree in social

work or social welfare and pass an examination.  SDCL § 36-26-15

(West 2022).

Ultimately, whether Ms. Termansen is a "medical source" or a

"nonmedical source," plaintiff is correct that her opinion is "evidence" and,

since the RFC formulation requires the consideration of all relevant evidence,

that opinion should have been considered by the ALJ in formulating plaintiff's

RFC.  But the ALJ *did* consider Ms. Termansen's opinion in formulating

plaintiff's RFC.  T27.  Therefore, the court moves on to the second

consideration:  whether the ALJ gave the proper weight to that opinion.

The ALJ did not rely on Ms. Termansen's opinion because it was largely

inconsistent with the objective medical evidence and because it was

inconsistent with Ms. Termansen's own treatment notes.  T27.  The court finds

this evaluation by the ALJ of Ms. Termansen's opinion appropriate under the

regulations and supported by substantial evidence in the record.

In February 2021, Ms. Termansen opined that plaintiff had no mental

ability or poor mental ability and aptitude to do unskilled work on thirteen out

67

of sixteen work skills. T516. She opined plaintiff would be absent from work more than three times per month due to her mental impairments. T517. Ms. Termansen also opined plaintiff had no mental ability or aptitude to do semiskilled or skilled work. T518. She opined plaintiff had fair, no, or poor ability to interact appropriately with the public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, or use public transportation. T518. Ms. Termansen rated plaintiff's impairments to be extreme and continual in the areas of maintaining social functioning, concentrating, maintaining persistence or pace, timely completing tasks, and episodes of decompensation. T519.

These opinions from Ms. Termansen stand in stark contrast to the opinions of Dr. Blegen and CNP Johnson, who found only mild and moderate limitations in plaintiff's mental functioning. T455-61, 550-57. Furthermore, these latter two opinions were based on actual examinations and testing, so they were better supported opinions. Id. Ms. Termansen's records do not reveal that she ever administered any tests and she only twice recorded observations about plaintiff's mental status.

After the ALJ hearing, Ms. Termansen issued another opinion. T8-9. She opined that plaintiff's anxiety, pain and depression made it difficult for plaintiff to leave her house. T8. Of course, the treatment notes discussed in detail above reveal only two or three times in the course of a year that plaintiff expressed fear of leaving her house and her fears were well-founded, not pathological. Ms. Termansen states that plaintiff had to reschedule

68

appointments due to migraines, but there are no records documenting this. Instead, Ms. Termansen's treatment records demonstrate that plaintiff met with her once or twice weekly for eleven months and only complained of migraines three times, yet kept her appointments despite the migraines.  One of those three times includes a notation that plaintiff took her migraine medication and it helped.

Ms. Termansen stated plaintiff's moodiness and inability to concentrate made it difficult to carry on a conversation with her.  T8.  But this is not reflected in Ms. Termansen's treatment notes, it is contrary to actual testing of plaintiff's concentration and memory done by Dr. Blegen and CNP Johnson, and it is contrary to plaintiff's own account of her daily activities.  She took care of her daughters on weekends and sometimes for up to a week at a time, she helped them with their homework, she helped her grandmother with her errands, she took care of her own house and personal care needs, including driving, shopping, and managing her finances.

Plaintiff insists the ALJ should have given more weight to Ms. Termansen's opinion because she was a treating medical source, not just an examining consultative source.  Under the new regulations, one's status as a treating medical source is no longer determinative.  Furthermore, Ms. Termansen only treated plaintiff for eleven months before the ALJ hearing. Dr. Broderson had treated plaintiff for many, many years and had treated her for her migraines as well as her mental impairments.  Dr. Broderson's lack of support for plaintiff's disability application speaks volumes.

In short, the court finds the ALJ was correct to find Ms. Termansen's opinion unpersuasive. The reasons for that decision were articulated by the ALJ. After examining the record as a whole, this court agrees that the ALJ's decision in this respect is supported by substantial evidence. Plaintiff's assignment of error regarding the weight given to Ms. Termansen's opinion is rejected.

### f.    Whether the ALJ Properly Formulated Mental RFC

Plaintiff's final argument is that the ALJ improperly formulated her mental RFC. Although the ALJ found plaintiff's mental impairments were severe and significantly limited her ability to perform basic work activities (step two), and found mild and moderate limitations in plaintiff's mental functioning (step three), plaintiff argues these findings do not find expression in the RFC. Specifically, the RFC including a finding that plaintiff "could attend to, sustain concentration, and carry out simple and complex activities within a schedule. She can meet the demands of a flexible and goal-oriented pace but cannot perform work at a production-rate pace or with very short deadlines. She is limited to occasional contact with the public." T23-24.

As explained above, the mere fact that limitations are found at step three does not necessarily mean that there must corresponding functional limitations in the RFC found at step four. Gann, 92 F. Supp. 3d at 884. The question is whether the RFC formulated finds substantial support in the record. Id.

Plaintiff argues the ALJ's mental RFC is inconsistent with her treating counselor's opinion and with Dr. Blegen's examination. This court has already

70

discussed Ms. Termansen's opinion at length above.  That opinion was properly rejected as inconsistent with Ms. Termansen's treating records, inconsistent with other objective medical evidence in the record, and unsupported by any testing or recorded observations of the plaintiff.  The court turns to a closer analysis of Dr. Blegen's report.

Plaintiff emphasizes that Dr. Blegen found that plaintiff suffered from "no less than four different mental disorders" including depressive disorder, PTSD, personality disorder, and substance abuse disorder.  Docket No. 9 at p. 22. But what is at issue in formulating RFC is not plaintiff's *diagnoses*, but rather how those diagnosed impairments impact her mental *functioning*.  Dr. Blegen noted that plaintiff herself stated her anxiety from her PTSD was controllable. T455.  Plaintiff herself described only mild issues with concentration, variable appetite, and irritability due to depression.  Id.

More to the point, plaintiff argues that Dr. Blegen found plaintiff's mental functioning flagged during the testing.  Docket No. 9 at p. 23.  Regarding ability to mentally function, especially to maintain concentration, persistence and pace, Dr. Blegen noted that plaintiff said she had placed about fifty job applications since being fired in December 2015.  T458.  This shows some ability to concentrate, persist, and carry through on tasks.

Plaintiff told Dr. Blegen her typical day consisted in helping her grandmother go places, working on her attempts to gain custody of her two daughters, checking in with friends, going to the store, and being with her kids or calling them.  T458.  Plaintiff stated when she is under stress, she has mild

to moderate problems with cognitive efficiency.  Id.  She described no problems with driving, ambulating, self-care, or managing her funds.  Id.  She said she could clean house, do laundry every day, and shop daily.  Id.  Again, this does not paint a portrait of a person substantially impaired in her ability to function mentally.

Dr. Blegen administered a biopsychosocial interview in which she asked plaintiff to describe her history of presenting problems, what medications she was taking, her history of mental health treatment, her education history, her employment history, her social functioning, her activities of daily living, and her legal history.  T455-58.  Dr. Blegen also administered a mental status exam which included a reading test, a reading aloud test, a reading comprehension test, a writing test, a spelling test, basic math (including addition, subtraction, division, and multiplication), verbal reasoning involving similarities and proverb interpretation, word recall, and clock drawing.  T455, 459-60. Dr. Blegen's report does not state how long she spent with plaintiff, but based on the tests administered and the breadth and depth of the subjects interviewed about, the court doubts plaintiff's characterization of the exam as "relatively short."  See Docket No. 9 at p. 23.

In any case, Dr. Blegen found plaintiff's memory—recent, remote, and working--were good to fair, normal.  T459-60.  She made good eye contact and her speech was normal, but mildly slowed.  T459.  Her alertness, attention, orientation, attitude, and social skills were all normal.  Id.  She exhibited hand wringing and rocking a few times, but was basically normal in terms of

psychomotor activities.  Id.  Plaintiff's mood, affect, thought content, thought process, judgment and insight were normal, though she was moderately dysphoric and cried appropriate to the discussion at the time.  Id.  Her processing speed began as normal, but slowed as the session progressed and her pace was only mildly below expected.  Id.  Her persistence and tolerance to the stress of the appointment was normal.  Id.  She exhibited no impulsivity or inappropriateness.  Id.  She exhibited a normal ability to follow directions and to fill out paperwork.  Id.  Her attention span was normal.  Id.  Although plaintiff's speed slowed as the session progressed, her cognition was not impaired.  Id.  In other words, she continued to do the work accurately, though more slowly.  Id.  Dr. Blegen found the test results to be valid.  T460.

The ALJ's mental RFC is utterly congruent with the exam results found by Dr. Blegen.  Dr. Blegen found plaintiff's concentration, persistence, attention, memory and ability to follow directions and engage in verbal and mathematical reasoning to be normal, but noted that her speed (i.e. pace) fell off as the session progressed.  T459-60.  The ALJ found that plaintiff could sustain concentration and carry out simple and complex activities within a schedule, so long as the demands were flexible and goal-oriented and not on a production-rate pace or with very short deadlines.  T23-24.  That is exactly what Dr. Blegen found, and Dr. Blegen's findings were based on objective testing as well as plaintiff's own reports of her functioning.

Furthermore, the ALJ's RFC is congruent with CNP Johnson's findings shortly before the hearing.  CNP Johnson found plaintiff's attention and

concentration to be normal/good and her recent memory to be normal.  T556. Plaintiff was oriented to person, place, time, and situation.  Id.  Her intelligence, fund of knowledge, and insight were all average/adequate.  Id. Her thought process was logical, realistic, organized and coherent.  Id.  Her thought content was goal directed and relevant.  Id.  Although she exhibited depressed, irritable, and tearful mood, this did not affect her cooperative behavior toward CNP Johnson.  Id.  Plaintiff was well-groomed, appropriate and had normal energy.  Id.

The court find the ALJ's mental RFC is supported by substantial evidence in the record.  Despite her symptoms, she is able to think and reason normally and accurately, though she cannot maintain a fast pace as time wears on.  This is exactly the concession made by the ALJ in formulating plaintiff's mental RFC.

Finally, plaintiff asserts that this court reversed and remanded under similar facts in Ruff v. Berryhill, 4:18-CV-04057-VLD, 2019 WL 267478 (D.S.D. Jan. 18, 2019).  But Ruff is inapposite.  In that case the claimant suffered mental impairments which significantly increased in severity in 2016.  Id. at *28.  The agency consultant had rendered an opinion on the claimant's mental RFC prior to the date of her notable decline.  Id.  The claimant's treating counselor rendered a mental RFC opinion after the decline.  Id. at *29.  The ALJ rejected the state agency consultant's opinion because it did not include significant later evidence, but also rejected the counselor's opinion.  Id.  Thus, the ALJ rejected the only medical source opinions as to the claimant's mental

RFC that were in the record.  Id.  Because RFC is a medical question and must be based on some medical evidence, this court remanded because there was no medical evidence supporting the ALJ's RFC.  Id. at *30.

In this case, the ALJ *did* base its RFC on medical evidence.  It specifically adopted the agency consultants' opinions on reconsideration and recited later-received medical records that were congruent with those opinions.  T26-27. The ALJ in this case also founded its RFC on plaintiff's activities of daily living (T27), while the ALJ in Ruff rejected the plaintiff's activities of daily living, characterizing them as "self-imposed."  Ruff, 2019 WL 267478 at *30.  The Ruff decision does not indicate a remand is the proper course of action in Ms. C.'s case.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby:

ORDERED that plaintiff's motion to reverse [Docket No. 8] is denied. Defendant's motion to affirm [Docket No. 10] is granted.

DATED October 18, 2022.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge